592 A.2d 634

PINE BELT CHEVROLET, INC., A NEW JERSEY CORPORATION,
NICHOLAS B. SPORTELLI, M.D. AND JEAN C. SPORTELLI,
HIS WIFE, PLAINTIFFS–RESPONDENTS, v. JERSEY CEN-
TRAL POWER AND LIGHT COMPANY, A NEW JERSEY PUB-
LIC UTILITY, DEFENDANT–APPELLANT, AND HAZEL F.
GLUCK, COMMISSIONER OF THE DEPARTMENT OF TRANS-
PORTATION OF THE STATE OF NEW JERSEY, AND THE
DEPARTMENT OF TRANSPORTATION OF THE STATE OF
NEW JERSEY, DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued March 26, 1991—Decided July 11, 1991.

Before Judges PRESSLER, DEIGHAN and ARNOLD M. STEIN.

*James H. Laskey,* of Counsel, argued the cause for appellant (*Norris, McLaughlin & Marcus, P.A.,* attorneys; *Donald D. Vanarelli* on the brief and reply letter brief).

*Dominic L. Aprile* argued the cause for respondents Pine Belt Chevrolet, Inc. and Sportellis (*Bathgate, Wegener, Wouters & Newmann,* attorneys; *Dominic L. Aprile* on the letter brief).

*Susan R. Roop,* Deputy Attorney General, argued the cause for respondents Gluck; Department of Transportation and State of New Jersey (*Michael R. Clancy,* Assistant Attorney

General, of Counsel; *Louis A. Haszu,* Deputy Attorney General and *Susan R. Roop* on the brief).

A brief was submitted by *Stryker, Tams & Dill,* attorneys for *amicus curiae* New Jersey Utilities Association, on behalf of Jersey Central Power and Light (*Richard B. McGlynn,* of Counsel; *Frances Farber-Walter* on the brief).

The opinion of the court was delivered by

DEIGHAN, J.A.D.

Defendant Jersey Central Power and Light Company (JCP & L) appeals from the grant of a summary judgment in favor of defendant New Jersey Department of Transportation (DOT) and plaintiffs Pine Belt Chevrolet, Inc. (Pine Belt) and Nicholas and Jean Sportelli. That judgment determined that JCP & L is responsible for utility pole relocation costs involved in the widening of Route 88, a state highway, as required by DOT as a condition for a driveway access permit issued to plaintiffs. The issue presented is whether the property owners, JCP & L or DOT should bear the expense of the relocation of JCP & L's utility poles.

The facts are not in dispute. Both plaintiffs own recently developed property adjacent to State Highway Route 88. During 1985 and 1986, Pine Belt constructed an automobile sales and service center and the Sportellis constructed a private residence and medical office. Both plaintiffs applied to DOT for permits and approvals for access to Route 88. Several utility poles owned and maintained by JCP & L were located in front of plaintiffs' respective properties. DOT informed plaintiffs that the curb line of Route 88 fronting their properties must be set back 22 feet from the highway's center line as a condition for approval of plaintiff's respective access permit applications. Further, JCP & L's utility poles were to be relocated beyond the curb line.

The site plan prepared by an engineering firm for the Sportellis provides for a widening of the highway. The Sportellis

submitted their plan to DOT and received the required permit. No determination was made as to who was responsible for the costs of relocation of the utility poles. After the Sportellis obtained the permits, their contractor proceeded to develop their property. The Sportellis subsequently contacted JCP & L to inform it that the utility poles abutting their property had to be moved. JCP & L refused to move the poles unless the Sportellis agreed to pay the costs of relocation. The Sportellis refused and thus the poles remained in the right of way of the relocated curb line.

As to Pine Belt, DOT made the same requirement that revised plans be submitted showing a 22-foot roadway from the center line of Route 88 and relocation of the JCP & L's utility poles beyond that line. Pine Belt refused to pay the relocation costs so JCP & L requested DOT to intervene. DOT notified Pine Belt that it was required to enter into an agreement for relocation of JCP & L's poles abutting its property and that its failure to do so within 30 days would result in revocation of DOT access permits. Without waiving its rights to challenge DOT's actions and JCP & L's failure to accept responsibility for moving its own utility poles, Pine Belt entered into an agreement with JCP & L and deposited $34,866.25.

After plaintiffs filed this action for a declaratory judgment, the parties moved and cross-moved for summary judgment. The trial judge granted plaintiffs' and DOT's motions and denied JCP & L's motion for summary judgment.

## I

The trial judge, in ruling that JCP & L was responsible for the costs of relocation of its utility poles, relied on *Port of N.Y. Authority v. Hackensack Water Co.*, 41 *N.J.* 90, 195 *A.*2d 1 (1963). There, the Supreme Court held that the Port Authority could not be compelled to absorb the costs of relocation of the utility facilities necessitated by improvements undertaken by the Authority. *Id.* at 106–08, 195 *A.*2d 1. The Court noted that

the obligation to relocate "rests upon the common law's view of the rights and responsibilities of the recipient of a so-called franchise to use the public streets." *Id.* at 96, 195 *A.*2d 1. The court rationalized that, as between the State and the public utility with respect to relocation of the utility's equipment, the utility

is permitted to use the public way because it serves a public interest, but since its venture is for gain and since in any event the primary purpose of the public easement is the public's own use of it, the utility's interest in the public way is subordinate to the public's enjoyment of it. Hence the utility runs the risk that the public welfare may require changes in the road which will call for relocation of its facilities.

*Id.* at 96–97, 195 *A.*2d 1; *cf. Sussex Rural Elec. Coop. v. Township of Wantage,* 217 *N.J.Super.* 481, 486–87, 491, 526 *A.*2d 259 (App.Div.1987) (where the utility's right antedates the public's right, forced relocation of utility transmission lines required by township's road construction project amounted to a compensable taking and the utility was entitled to recover costs of relocation). Emphasizing that any change in the common law doctrine "should be left to legislative decision," the Court noted that the "Legislature changed the rule of the common law with respect to toll roads in New Jersey Highway Authority Act, (*N.J.S.A.* 27:12B–6), New Jersey Expressway Authority Act (*N.J.S.A.* 27:12C–16) and New Jersey Turnpike Authority Act of 1948 (*N.J.S.A.* 27:23–6).... [And] the Legislature shifted the burden of relocation in *N.J.S.A.* 27:7A–7, which deals with non-toll freeways and parkways." 41 *N.J.* at 107, 108, 195 *A.*2d 1.

Since the Supreme Court in *Port of N.Y. Authority* noted that any change in the common law doctrine "should be left to legislative decision," JCP & L and the *amicus curiae* point out that pursuant to *L.*1983, *c.*283, § 1, eff. July 29, 1983, the legislature has mandated such a change from the common law by the enactment of *N.J.S.A.* 27:7–44.9(a), which provides in relevant part:

Whenever the commissioner determines that it is necessary that facilities which now are, or hereafter may be, located in, on, along, over or under any highway

project shall be relocated in the project or should be removed from the project, the public utility ... owning or operating the facilities shall relocate or remove the same in accordance with the order of the commissioner.

## The statute further provides:

The *costs and expenses of such relocation* ... including the cost of installing the facilities in a new location ... *shall be ascertained and paid by the commissioner as a part of the cost of the project.* [Emphasis supplied.]

## Subsection (b) defines "highway project:"

As used in this act, 'highway project,' *in addition to its ordinary meaning,* means one which is administered and contracted for by the commissioner. [Emphasis supplied.]

## Under the New Jersey Highway Authority Act, *N.J.S.A.* 27:12B–3(d) defines a "highway project" as

any express highway, superhighway or motorway ... acquired or to be acquired or constructed or to be constructed under the provisions of or this act by the authority....

## The trial court ruled that

[t]he statute does not require the commissioner to pay for the relocation in this case. Initially, I note that the commissioner did not order *the utility* to relocate the poles. More importantly, this was not a project administered and contracted for by the commissioner.

I interpret this qualification to limit, not expand, the term 'highway project' and to require the commissioner to pay relocation costs on highway projects that he both administers and contracts for. [Emphasis supplied.]

JCP & L claims that *N.J.S.A.* 27:7–44.9 abrogates the common law duty of a utility to pay for pole relocation when a "highway project" is initiated by DOT for the public welfare. JCP & L contends that under *N.J.S.A.* 27:7–44.9, DOT is liable because the widening activity was a "highway project" administered by DOT. On the other hand, DOT argues that because no "highway project" exists for the full widening of Route 88, it is not responsible for the costs of relocating the utility poles adjacent to plaintiffs' properties. Alternatively, JCP & L contends that plaintiffs, private property owners whose application for the driveway access permit required the utility pole to be relocated, are responsible for this undertaking. It further asserts that the question of benefit generates a factual issue precluding the grant of a summary judgment in favor of plaintiffs.

Plaintiffs private property owners argue that under common law, JCP & L should bear the costs of relocating the utility poles or, alternatively, DOT ·should bear the costs under *N.J.S.A.* 27:7–44.9. The *amicus curiae* contends that the Legislature unambiguously voiced its intent to shift the costs of utility relocation from the utility taxpayers to the motoring public.

## II

In interpreting a statute, primary regard must be given to the fundamental purpose for which the legislation was enacted. *New Jersey Builders Ass'n v. Blair,* 60 *N.J.* 330, 338, 288 *A.*2d 855 (1972); *Wene v. Meyner,* 13 *N.J.* 185, 98 *A.*2d 573 (1953) (the reason of the statute prevails even over the literal sense of terms); *Public Serv. Elec. & Gas Co. v. Rodriguez,* 195 *N.J.Super.* 252, 478 *A.*2d 1231 (App.Div.), *certif. granted,* 99 *N.J.* 182, 491 *A.*2d 686 (1984), *dismissed as moot,* (1985) (first attention is to determine the purpose of legislation). The meaning of the statute is to be gathered from the object and nature of the subject matter, the contextual setting, and the mischief sought to be eliminated as well as the proposed remedy. *Brewer v. Porch,* 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969); *San–Lan Builders, Inc. v. Baxendale,* 28 *N.J.* 148, 155, 145 *A.*2d 457 (1958).

Also, the legislative history of an act and contemporaneous construction of other laws pertaining to similar subject matter may furnish important light as to the purpose and plan of the legislature. *Key Agency v. Continental Cas. Co.,* 31 *N.J.* 98, 103, 155 *A.*2d 547 (1959). Our courts have held that public policy is the true key to understanding a statute. *In re Roche's Estate,* 16 *N.J.* 579, 587, 109 *A.*2d 655 (1954); *Fischer v. Fischer,* 13 *N.J.* 162, 168, 98 *A.*2d 568 (1953). Public policy considerations exert a significant influence in the process of statutory interpretation by the courts. 2A *Sutherland Stat. Construction,* § 56.01, at 627 (4th ed. 1984). Further, state-

ments appended to legislative bills are useful aids to ascertain legislative intent. *Howard Savings Inst. v. Kielb,* 38 *N.J.* 186, 195, 183 *A.*2d 401 (1962); *Sutherland, supra,* § 48.10, at 318.

The Assembly Revenue, Finance and Appropriations Committee Statement setting forth the purpose and policy of *N.J.S.A.* 27:7–44.9 states:

> Presently, the expense of utility relocations for land service road improvements are financed through the utility's rate structure and are ultimately paid by the utility's rate payers. Enactment of this legislation recognizes that *the cost of utility relocation is properly a component of the total costs of highway improvement.* These costs should not be paid by the utility rate payer who is already burdened with escalating prices associated with the increased cost of energy, but should come from the same broad State and federal tax base which provides for the highway improvement. . . .
>
> . . . The principal [sic] behind this bill is to shift utility relocation costs from utility rate payers to highway project costs.

*Id.* (emphasis supplied). Clearly, the statute and the Assembly Statement state that the purpose of the statute is to relieve utility rate payers from the expenses occasioned by highway improvement.

Utilities can normally budget and plan for their own needs and for improvements to benefit their customers, as indeed they must, pursuant to their statutory obligation to "furnish safe, adequate and proper service and to maintain [their] property and equipment in such condition as to enable [them] to do so." *N.J.S.A.* 48:2–23. It would appear that it is impossible for utilities to predict or control highway improvements pursuant to driveway access permit regulations. Such expenses are more properly budgeted and planned for within DOT, the department that administers the program. Indeed, the legislature explicitly intended that "[t]he bill give[ ] the department complete control of all components and costs of those projects. This will reduce the overall cost of highway improvements by permitting more effective and efficient project management and engineering." Assembly Statement, *supra.*

Title 16 of the New Jersey Administrative Code pertains to regulatory provisions of the Department of Transportation.

Chapter 25 (Utility Accommodation) has been promulgated to implement *N.J.S.A.* 27:7-44.9. Chapter 25 applies to all public, private and cooperatively owned utilities that are to be located, adjusted or relocated within the rights-of-way under the auspices of DOT. *N.J.A.C.* 16:25-1.3. In Subchapter 10 (Permits and Agreements), *N.J.A.C.* 16:25-10.10(f), concerning responsibility for costs, provides:

> If any subsequent change in the highway facility necessitates the moving or adjusting of utility facilities located by a permit, or operation of law on, over, under, or across highway right of way or other highway property, *then the Department [DOT] shall bear all costs and expense of such required move or adjustment.* [Emphasis supplied.]

In Subchapter 12 (Utility Relocations and Adjustments), *N.J.A.C.* 16:25-12.1(a) provides that

> [r]eimbursement to utility owners for required relocations and adjustments of existing utility lines, systems and facilities required by highway construction or improvements shall be made in accordance with the detailed procedures of Federal Highway Administration, Federal-Aid Highway Program Manual 6-6-3-1.... [T]he determination of eligibility for reimbursement shall be made pursuant to applicable State law, both statutory and case ... and should be administered, as follows:
>
> ....
>
> (5) existing investor owned utilities located on existing State highway right of way by statutory grant and/or written consent of the Department shall be considered as eligible for reimbursement. [Footnote omitted.]

Subsection (b) of *N.J.A.C.* 16:25-12.1 provides: "The general criteria outlined in (a) above for determining eligibility for reimbursement for relocation costs shall be applied on the basis of the actual location of the existing utility facility in relation to existing highway right-of-way...." Subsection (c) then provides:

> The general criteria outlined in (a) above shall apply in determining eligibility for reimbursement for the relocation of utilities on any construction or improvement project administered (constructed) by the Department, except on projects on which determinations of eligibility are unnecessary due to the Department contracting with other agencies or political subdivisions of the State government to make arrangements for utility relocation.to be provided at no cost to the Department.

The above regulations mandate that in situations where DOT requires relocation of utility lines, payment is to be made by DOT and not the utility. It is significant that these regulations

are not limited to a "highway project" but pertain to "a permit to be issued to provide for any utility construction, major maintenance or related work on State Highway rights-of-way or property." *N.J.A.C.* 16:25–10.1(a). *N.J.A.C.* 16:25–12.1(a) pertains to "[r]eimbursement to utility owners for required relocations and adjustments of existing utility lines, systems and facilities required by highway construction or improvements."

Further, there can be no dispute that widening Route 88 is in keeping with a long-range design or plan for highway improvement and is a highway project within the ordinary meaning of that term. The 22-foot right-of-way for one lane of a two-lane highway is imposed by DOT in accordance with its Design Manual–Roadway, which requires two-lane roads such as Route 88 to have roadway lanes of 12 feet and shoulders of at least ten feet. In order to implement this policy, DOT requires all applicants for roadway access permits along Route 88 to comply with the lane and shoulder width requirements of the manual. Consistent with this policy, DOT issued a total of 74 driveway access permits between 1985 and 1988 for construction along Route 88, and each permittee was required to widen the roadway to 22 feet from the center line. This right-of-way width requirement has been consistently applied in order to carry out DOT's long-range project of widening Route 88.

DOT is systematically achieving its goal through control over access to and construction along state highways. No driveway access permits are issued unless the permittee agrees to widen the highway and either relocate all utility poles or make arrangements with the utility for the relocation of poles. Section 1–01 of the manual states that "current Department policy pertaining to roadway design ... will provide a means of developing uniformity and safety in the design and plan preparation of a highway system consistent with the needs of the motoring public." As noted in a traffic report prepared by Storch Engineers for DOT concerning a Route 88 study in the Townships of Lakewood and Brick and the Borough of Point Pleasant, at Section VI–1, "the results of the arterial analysis

demonstrate that on certain portions of Route 88, the existing configuration of one travel lane in each direction is not adequate to provide a Level of Service for the Year 2007 traffic." This is fortified by a letter dated November 17, 1986, from the regional No. 3 maintenance engineer to the attorney for the Sportelli's wherein he advised that "Region III Permit 3 Unit is following a standard operating procedure when it suggests that your client, Dr. Sportelli, is responsible for the relocation of utility poles in the area covered by the permit."

It is only logical to conclude that DOT has a long-range program to eventually widen Route 88. Otherwise it would be nonsensical to require in piecemeal fashion that a curb line be installed 22 feet from the center line of Route 88 and that utility poles be relocated. *N.J.S.A.* 27:7–44.9 "gives the department complete control of all components and costs of those projects" "associated with the relocation of utility facilities in the overall costs of a highway project."

At the same time, in view of increased costs of future installation and relocation, such a program would assure lower financial costs by present installation of these improvements. Moreover, if the State does not already own the right-of-way to a distance of 22 feet from the center line, it acquires the additional width as a condition to install driveways without the costs of future condemnation for the same extension of the right-of-way. Even if DOT were required to extend the right-of-way by condemnation, with inflationary trends of the economy, the costs of acquisition would be less at the present time than in the future when the long-range plan of widening Route 88 is accomplished. We are therefore satisfied that the cost of this highway improvement project at the behest of DOT should be paid by that agency. The widening of Route 88 was to be required by DOT in any event sometime in the future.

Of course, if public safety requires the installation of an acceleration, deceleration or storage lane in the public right-of-way for safety reasons, created by an increase in traffic in a

commercial or housing development that requires relocation of a utility, then the development may be the primary beneficiary and therefore required to underwrite the costs of relocation of any utility poles necessitated by the development. *See In re Petition of Cinnaminson Properties, Inc., New Jersey Bd. of Pub. Utils.*, No. 736-431 (1974). *See also Sussex Rural Elec. Coop.*, 217 *N.J.Super.* 481, 526 *A.*2d 259 (concerning a forced relocation of utility transmission lines due to municipality's road construction project). However, if the relocation of utility poles is required because of an extension or an expansion required to furnish safe, adequate and proper service and to maintain their property and equipment to enable them to do so for the benefit of the utility, then the costs would be borne by the utility. *See N.J.S.A.* 48:2–23.

## III

■ In our view, the trial court applied an unduly narrow definition of "highway project." As has been pointed out, under the long range planning of DOT, the widening of Route 88 was an on-going project for future improvement. We are convinced that this was a "highway project." Also, contrary to the expansive definition of highway project in *N.J.S.A.* 27:7–44.9, as being "in addition to its ordinary meaning," the trial court interpreted the statute to limit, not expand, the term "highway project." The phrase "in addition to" can mean "and," "also," "besides" and "as well." *See Webster's Ninth New Collegiate Dictionary* 75 (1984); *Black's Law Dictionary* 71 (5th ed. 1979). In any event, the phrase denotes that something is to be added to what precedes it; it *expands*, rather than *limits*, the ordinary meaning of "highway project."

Nor do we agree with the trial judge when he found that "this was not a project administered and contracted for by the Commissioner." As we noted above under *N.J.A.C.* 16:25–12.1(c), the general criteria for reimbursement to utility owners for required relocations of existing utility lines on any construc-

tion or improvement project applies to those "administered (*constructed*) by the Department, except on projects on which determinations of eligibility are unnecessary due to the Department *contracting* with other agencies or political subdivisions of the State government to make arrangements for utility relocation to be provided at no cost to the Department." (Emphasis supplied.) Thus the long term improvement of Route 88 on an *ad hoc* basis is a highway project "administered" by DOT. It is a direct undertaking by DOT in supervising every phase of the highway widening and pole relocation project because of the requirement to submit detailed plans concerning the extension from the center line of Route 88 to a curb line to be placed 22 feet from the center line.

█ The interpretation given by the trial court misreads the statute by requiring DOT to both administer *and* contract for a highway project. DOT may *administer* some projects that are not subject to outside contracts, such as those its own staff performs. On the other hand, it may *contract* with other agencies or political subdivisions of the State government for relocation of the utility poles at no cost to DOT. Further, if DOT contracts or subcontracts a portion of the highway improvement to private contractors, which requires the relocation of utility poles, then DOT may require the private contractor or subcontractor to arrange with the utility for the relocation of the utility poles, in which event the costs and expenses of such relocation would be paid for in the contract price or may be directly paid by DOT.

We are convinced that the Legislature has undertaken to change the common law rule requiring utilities to underwrite the cost of relocating its facilities with respect to toll roads and non-toll freeways and parkways. *Port of N.Y. Auth.*, 41 *N.J.* at 107, 195 *A.*2d 1.[1] In enacting *N.J.S.A.* 27:7–44.9, the legisla-

---

[1]There are similar provisions in statutes relating to other subjects: *Sewerage Authorities Law (N.J.S.A.* 40:14A–20); *The Port Authorities Law (N.J.S.A.*

ture has found it more appropriate that DOT undertake obligations for public utility relocation costs incurred in connection with highway improvements rather than to charge the utility for those costs. Under this policy, when DOT pays, the monies ultimately come from the beneficiaries of the highway improvements, *i.e.*, the motoring public through other sources such as federal or state public funds or gasoline taxes. On the other hand, when the utility pays, the costs are ultimately borne by the utility rate payers, including the non-motoring public and low income tax payers, even though the highway improvement does nothing to improve utility service.

Reversed and remanded for entry of summary judgment against DOT consistent with this opinion.

40:68A–54); *Local Housing Authorities* (*N.J.S.A.* 55:14A–39); *New Jersey Water Supply Act* (*N.J.S.A.* 58:19–19); *New Jersey Water Supply Law,* 1958 (*N.J.S.A.* 58:22–14). *Port of N.Y. Auth.,* 41 *N.J.* at 108, 195 A.2d 1.